425 So.2d 683 (1982)
STATE of Louisiana
v.
Burl L. PARKER.
No. 81-KA-2050.
Supreme Court of Louisiana.
May 17, 1982.
On Rehearing November 29, 1982.
Rehearing Denied February 11, 1983.
*684 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., William E. Tilley, Dist. Atty., Asa A. Skinner, Asst. Dist. Atty., for plaintiff-appellee.
F. Clay Tillman, Jr., of Simms, Tillman & Fontenot, Leesville, for defendant-appellant.
BLANCHE, Justice.[*]
Defendant, Burl L. Parker, was convicted of first degree murder, a violation of R.S. 14:30, and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Parker appeals his conviction to this Court, raising nine assignments of error. Finding reversible merit as to one of these assignments, we pretermit consideration of the remaining errors assigned by defendant.
Defendant's mother, father, sister and half brother were found shot to death. The mother and sister died at the family home in Vernon Parish; the father and half brother in a wooded area of Claiborne Parish. The discovery of all four bodies resulted from information provided the authorities by defendant himself. In statements made before and after his arrest, defendant claimed that his half brother, Wilbur Edwards, was the perpetrator. According to Parker, his half brother shot his mother and sister before taking his father and himself hostage and driving them to Claiborne Parish. Defendant claimed that when they stopped in a wooded area, he grabbed Edwards' gun and killed him, but not before Edwards had killed defendant's father and wounded defendant. In the instant case, Parker was only charged, tried and convicted of the death of his mother.

Assignment of Error Number 7
By this assignment of error, defendant challenges the trial court's denial of his motion for a directed verdict based upon the law and the evidence. We recognize that directed verdicts of acquittal are no longer available in jury trials. See C.Cr.P. art. 778. Even so, this Court has held that when the sufficiency of evidence is raised by a formal assignment of error, the matter is preserved and is subject to appellate review. State v. Edwards, 400 So.2d 1370 (La.1981).
At trial, it was established that on the evening of July 17, 1977, at approximately 8:30 p.m., the Vernon Parish Sheriff's Office received a long distance telephone call. The caller identified himself as Burl Parker, and requested to speak with Deputy D.B. Davis. Parker, who spoke in a calm and controlled manner, informed Deputy Davis that there had been a murder, that there "were people all over the ground" and that he himself had been shot, but that he "had gotten the boy". When the deputy attempted *685 to ascertain where defendant was calling from, Parker responded, "I'll tell you when I get there. I'll be there in a few minutes." Nearly two and one half hours later, defendant arrived at the police station. By that time, Deputy Davis had gone off duty, but had informed Deputy Steven Rodina of defendant's phone call and his anticipated arrival.
Deputy Rodina first observed defendant about 11:00 p.m. as Parker was proceeding up the walkway that led to the Sheriff's office. He was accompanied by another officer and had a .32 caliber Smith & Wesson pistol in his hand. As Rodina approached Parker, he was told, "I killed the man, and here's the gun." At this point the officers took the gun away from defendant and led him into the Sheriff's office. Deputy Rodina noticed that defendant had an injury to his lower left side that "didn't seem to be a real bad wound." When asked whether he had been shot, defendant replied, "Yes, but I got the man." At no time did defendant request, nor the officers offer, medical assistance for defendant's injury. Deputy Rodina then asked defendant where the shooting took place and how many were dead. To this inquiry defendant responded, "No, I don't know. I picked up a hitchhiker, he forced us all in the car and made us drive to Corney Lake. There are at least three dead and maybe four." Parker refused to elaborate on the shootings until "after I talk to the right people." Defendant told Deputy Rodina that his mother was dead, that he told Deputy Davis about his mother and that Davis was "suppose to check it out".
James Hagan, an investigator for the Vernon Parish District Attorney, arrived at the Sheriff's office at about 11:30 p.m. Though Parker refused to sign a waiver of rights form, he voluntarily submitted to Hagan's interrogation. Concerning his questioning of defendant, Hagan testified that Parker told him that shortly after lunch, he was out in a small shop, or shed, which he described as a workshop doing some woodwork. This workshop was located in the rear of the family home.
"He indicated that he was possibly working on a gun rack. At some time, maybe 30, 40 minutes or an hour after he was there, he heard a gunshotone single shot at the direction of the house which he lived inand at that point, he went to investigate to see exactly what happened. He said he entered the house, and when he entered the house, he found his mother lying in the hallway where she had been shot in the head with some type of weapon. At that point, a guy who he describedor said a guy named Edwards that's all he could tell me, he said a guy named Edwards took he and his father hostage, put them in his car and drove them to North Louisiana, near Homer, Louisiana, and there, he shot his father and killed him and he and the boy got into a scuffle. He eventually got a gun that the boy had in his belt out of his belt and shot and killed the boy."
Hagan requested that Deputy Rodina go to the defendant's house in order to corroborate Parker's story. In the house, the officers discovered the body of defendant's mother, Izella Parker. A later inspection of the grounds surrounding the house revealed the existence of another body, that of Audrey Parker, defendant's sister. Both victims had been shot in the head.
The Claiborne Parish Sheriff's Office was notified that the Vernon Parish Sheriff's Office had a suspect in custody who claimed there were two bodies in the Corney Lake area. A search of the vicinity near the lake uncovered the existence of two more bodies: defendant's father and defendant's half brother, Wilbur Edwards. Like the sister and mother, these victims had been shot to death. The half brother was lying face down with a rifle positioned beneath him and still in his grasp.
On July 22, five days after Parker was arrested, Deputy Sheriff Gary Bowden took a written statement from the then 61 year old defendant. Bowden also secured a broken-down double barrel shotgun from the trunk of the vehicle driven by defendant, as well as a sawed-off .22 caliber rifle. According to defendant's statement, which *686 was offered in evidence, the following events occurred:
On Sunday morning, July 17, Parker was working on some gun racks at his workshop located behind the family residence. In an attempt to finish his project, Parker did not go into the house to eat lunch. Suddenly, his half brother, Wilbur Edwards, appeared at the door of the shop. He had a .32 caliber pistol in his pants and was carrying a .22 automatic rifle. When defendant's dog attacked Edwards, the half brother killed the dog and told Parker the same thing would happen to him unless Parker went with him and did exactly as he was told. Defendant was ordered to retrieve a sawed off .22 rifle from his shop and place it in Audry Parker's blue Datsun.
Defendant was brought into the family residence and was shown the body of his mother. According to Parker, his half brother told him, "I've killed them both." However, Parker claims that he never saw his sister's body. Edwards ordered defendant to help him search for ammunition for the .22 caliber sawed off rifle. Defendant alleged that his half brother "had already got one box of ammo that was setting out on the table."
Edwards then informed defendant that they were going to pick up their father and that defendant had better "keep your mouth shut, don't you tell daddy that I've killed them." Parker stated that when they arrived at their father's church house Edwards began to tell the father that he was going to kill his wife and mother in law and that "You all double crossed me with my wife."
At this point, Parker claimed that his half brother led him and the father out to the blue Datsun with a double barrel shotgun. When Edwards couldn't fit the shot gun behind the front seat, he broke it down and placed it in the back of the car. Parker and his father were then forced into the car, the father in the front passenger seat, and defendant in the back seat.
According to defendant, they drove toward North Louisiana, making several stops to quench their thirst, get gas, and for the purpose of changing drivers. Finally, the Datsun and its occupants arrived at the Corney Lake area. Defendant, who was familiar with this area, suggested they turn off the main road and rest at a nearby spring. Edwards and the father got into an argument about the father's knowledge that Edwards' wife was going to leave him and his attempt to conceal that information from Edwards. Parker claimed that Edwards suddenly became violent, stepped toward him and the father, and shot at defendant with the .22 caliber automatic rifle. When the first shot missed defendant, he struggled with Edwards over the rifle and managed to grab the .32 revolver out of Edwards' waistband. Edwards managed to fire two or three more times, once striking defendant, before Parker was able to shoot Edwards with the .32 caliber pistol as his half brother hovered over him.
Parker claimed he was stunned and remained on the ground for a few moments. When he regained his composure, he looked around and saw that his father had been shot and killed during the exchange of gunfire. Defendant picked up the pistol and got in the blue Datsun to get help. As he approached the main roadway, he became physically ill and stopped for a few minutes. At this point, a sheriff's vehicle passed right in front of him, slowed down, and observed defendant about to pull out of the woods. Parker claimed that he tried to catch the officer, but could not find the patrol car after it rounded a nearby curve. Parker continued to drive on, past a church gathering, and through the town of Bernice before stopping at Hodge. Here, he called the Vernon Parish Sheriff's Office and told them of the homicides. Defendant claimed that he told the police he would be at the sheriff's office in a few minutes, "but I was mistaken and it was further away than I thought."
All of the physical evidence recovered by the law enforcement officers was sent to the Northwest Crime Lab for analysis. According to the testimony of the state's criminologist, Ray Heard, this evidence included one plastic bag containing a .32 Smith & *687 Wesson revolver with four .32 caliber hulls and two .32 caliber cartridges; one plastic evidence bag containing one .22 caliber bullet found in the head of Audry Bond; one plastic bag containing a piece of red material; one plastic bag containing one .32 caliber bullet found in the hallway at the feet of Mrs. Parker; one plastic bag containing one white gown of Mrs. Parker's and blue blouse, etc.; one model .22 caliber Stephens rifle; one model .22 caliber J.C. Higgins rifle; one model Rome .22 caliber revolver; one bag containing .22 caliber hull found at the entrance to shop; one plastic bag containing.32 caliber bullet from Mrs. Parker; and one model 67-A .22 caliber Winchester rifle with barrel and stock cut off.
Tests showed that the bullet found at the base of Audry Parker's head originated from the .22 sawed off rifle, the weapon Parker claimed he was told to retrieve from the workshop when taken hostage. The .32 Smith & Wesson pistol fired the shots which killed both Izella Parker and Wilbur Edwards. Defendant's father was shot with a .22 caliber bullet, but because it was severely damaged, the crime lab was not able to determine the bullet's origin. However, none of this physical evidence was introduced at trial. Mr. Heard testified that the crime lab, while in the process of ridding its storage area of unnecessary evidence, inadvertently disposed of the physical evidence recovered by the state in the instant case. As there were no witnesses to the homicides, the state's case against Burl Parker rested entirely upon circumstantial evidence.
In presenting its case, the state attempted to prove that Parker was the perpetrator and had fabricated his scenario in order to conceal his guilt. To dispel defendant's claim that he and his father were abducted by Wilbur Edwards, the state relied primarily on the testimony of Bill Doherty. This witness knew the defendant, as well as the victims, for a substantial period of time. After having established his relationship with Wilbur Edwards, he was asked if he remembered seeing Wilbur on the 17th of July. He said that he saw him at approximately 1:30 on that particular Sunday afternoon. At the time, Doherty was parked in his car. With him were David Jackson, Kenny Jackson, Gary George, Johnny Doherty and Dave Drew. When he first saw Wilbur Edwards, he was on the left hand side of the road some 90 ft. away. He tooted his horn at Wilbur, and Wilbur turned around and began walking back up the road to where Doherty was parked. At about that time, a little blue car "whipped in" between the Doherty vehicle and Edwards. Wilbur Edwards walked up to the car and the driver got out of the driver's side and into the passenger's side. At that time, Wilbur bent over the car and clenched his hands behind him in some manner. However, whatever signal he gave, it was taken by Doherty to mean that he could go on, so he pulled off. As he drove by, Doherty recognized the man in the car as Burl Parker. The last time he saw Wilbur Edwards, he was walking to the driver's side of the car. The other occupants of the Doherty vehicle gave similar testimony.
The sum total of these witnesses' statements was to the effect that they saw Burl Parker pick up Wilbur Edwards at about 1:30 that afternoon and that Burl initially was driving the blue Datsun and moved over to the passenger seat as Edwards got behind the driver's wheel. According to the state, this testimony conclusively established that it was defendant who abducted Wilbur Edwards, and not Edwards who abducted defendant.
However, we note that throughout the investigation, defendant referred to his half brother as "the boy", "the man", or "Edwards". In his statement to Deputy Rodina, Parker stated he had picked up a "hitchhiker" on the day of the murders. It is conceivable that this was Parker's way of articulating that he had stopped to give his half brother a ride. This admittedly unusual means of referring to Edwards is explainable. The record indicates that though Wilbur Edwards was known in the community as Parker's half brother, he may have been nothing more than defendant's foster brother. The 35 year age difference between Parker and Edwards, as well as *688 the extreme age of defendant's parents substantially support this conclusion. As a result, it is likely that Parker did not look upon Edwards as a true sibling but thought of him as a mere acquaintance.
The state also attempted to establish that after Burl Parker exited the wooded area around Corney Lake he took action designed to avoid a confrontation with the deputy on patrol. Deputy Danny Lee was the Claiborne Parish officer on patrol near Corney Lake, which is located near Kisatchie National Forest. Deputy Lee testified that, on July 17 at approximately 5:30 p.m., he observed a small blue Datsun automobile coming out of a log road in from the national forest. When he saw the blue Datsun coming out, he slowed down to about 15 MPH to see what the car was doing coming out of the woods. He stated that he didn't stop because there are always people coming out of the woods. According to the deputy, the Datsun stopped when it saw him. There was no doubt that the driver had observed him in the patrol car. He was not more than 30 feet away. Deputy Lee then proceeded on and went around a curve. He could still observe the blue vehicle in his rear view mirror and the car never moved. Lee claimed that he proceeded on down the road and took a left, going onto Lake Road. The deputy was even able to identify defendant as the operator of the blue vehicle.
Concerning this alleged attempt on the part of Parker to avoid detection by the patrol car, we note that defendant himself gave a similar version of events:
I saw a Sheriff's car pass right in front of me and go on I know he saw me because he slowed up I said I'll catch him this is my lucky day by the time I got down the hill and to the road he had gone around the curve and I didn't catch him I drove on down the road and came to a church and they were ganging up around the church door.
On cross examination of this witness, defendant's counsel was able to demonstrate defendant's difficulty in catching the officer's vehicle: "So, if someone had picked up and followed you and not known that you had turned off, he would have come out by the church, is that right?" To this inquiry, the deputy responded affirmatively. Evidently, it would have been impossible to follow the patrol car not knowing that it turned off the road. Further, the officer's testimony supported defendant's claim that continuing down the road led him to a church.
Deputy Lee also testified that when he was notified that two people had been killed on the log road in question, he went back there and found the bodies of James Parker and Wilbur Edwards. Edwards was laying face down on the ground, and a .22 rifle was clutched in his hands underneath him. It had one .22 caliber bullet jammed in the cylinder. James Parker was lying on his back about ten feet away from Edwards. This statement by the officer concerning the positioning of the bodies gave credibility to defendant's version of his half brother's and father's deaths. Further, defendant stated that Edwards "hovered" over him as defendant shot in self defense. Armed with this statement, the state clearly could have offered evidence establishing the angle at which the bullets entered Edwards' body, as well as the possible existence of powder burns on the half brother's body. Because this was never done, the defendant's explanation appears, at the very least, as plausible as the state's explanation.
We are also of the opinion that defendant's possession of the murder weapons when taken into police custody was not incriminating. Parker, in his statement, claimed that as Edwards approached him at his workshed, Edwards had the .32 Smith & Wesson pistol in his waistband. This gun was used to kill the mother, who had already been shot before Edwards allegedly abducted defendant, and is the same pistol Parker claims he wrestled away from his brother and used in self defense. According to Parker, he carried the pistol with him when he travelled from Lake Corney to the Vernon Parish Sheriff's Office. Defendant's explanation as to his possession of this firearm is totally consistent with his explanation *689 of the shooting. Further, the state offered no evidence which refuted defendant's claim that his half brother shot defendant's dog. The record is void as to any other reference to the dog except in defendant's statement to Deputy Rodina.
Defendant's story about his half brother ordering him to pick up the .22 caliber sawed off rifle apparently creates an inconsistency in his statement. As noted by the state, if this .22 rifle was in defendant's possession, how could the half brother have used it to kill defendant's sister? However, we note that the state failed to offer any evidence as to the sister's time of death, or her whereabouts before her death. There was some evidence which indicated that Audry Parker had been dragged to the place where her body was found. Complicating this theory is the fact that the .22 bullet, which originated from the sawed off .22 rifle, was found beneath her head at a place which could have been observed from the workshop. Though Parker claimed he had been at the workshop since breakfast, it is conceivable that the sister could have been killed elsewhere earlier in the morning and the rifle was, in some manner, returned to the workshop before Parker became aware of her death. This conclusion is supported by defendant's statement, in which he contended that on the morning of the homicides, his half brother had been working on his sister's car in the back yard and that he had only heard a single gunshot. Defendant stated that he didn't know his sister was dead until his brother told him after lunch. Further, defendant claims that when he accompanied his half brother into the family house in search of ammunition for the .22 rifle, "he (Edwards) had already gotten one box of ammo."
The state also failed to establish the kind of wound defendant had when he arrived at the sheriff's office and presented inconsistent evidence as to its severity. No evidence was offered by the state to establish that defendant's wound was not the result of a gunshot; nor did the state ever attempt to determine whether the wound was self inflicted, or the result of a struggle with another individual. Further, the state's own witnesses gave conflicting testimony concerning the seriousness of Parker's wound. The testimony established that distance between the point of entry and exit could have been as close as one inch, or as distant as six inches.
Defendant, by this assignment of error, asserts that his conviction should be set aside because there is insufficient evidence to establish his guilt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jackson standard requires this Court to determine whether any reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, accepting the facts most favorable to the prosecution. Further where, as in this case, defendant's guilt is supported entirely by circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. R.S. 15:438. Correlating this rule relative to circumstantial evidence with Jackson v. Virginia, we concluded in State v. Austin, 399 So.2d 158 (La.1981), that: "when we review a conviction based upon circumstantial evidence we must determine that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded."
We are of the opinion that the circumstantial evidence presented by the state did not establish defendant's guilt beyond a reasonable doubt. For its part, the state established that defendant arrived at the sheriff's office with the .32 caliber pistol used to kill his mother and stepbrother and alerted the officers to the location of the sawed off .22 caliber rifle used to kill his sister. Further, the state produced witnesses whose accounts of defendant's movements on July 17 were clearly inconsistent with Parker's claims of his forced abduction. Finally, the written confession contained at least one major inconsistencyhis sister was killed with the sawed off .22 caliber rifle which Parker claimed was with him in the work shed when Edwards appeared after killing both the mother and *690 sister. The state claims that this circumstantial evidence was of sufficient magnitude to refute Parker's version of the homicides and, thus, exclude every reasonable hypothesis except that of defendant's guilt.
We acknowledge that the state, by establishing certain flaws in defendant's statement, questioned the veracity of Parker's account. On the other hand, there is much evidence which corroborates that statement, especially concerning the killing of Wilbur Edwards and his father. Parker placed himself and Edwards at the residence when his mother was killed. The state offered no evidence to exclude the presence of Edwards so as to prove beyond a reasonable doubt that defendant, and defendant alone, was the only one who could have killed his mother. But, after all, no evidence was offered to establish the time of death of any of the victims.
With regard to his sister, a murder for which he is not being tried, the exact location where she was killed is somewhat clouded, as evidence at the scene suggested she might have been dragged to the spot where she was found. A fact casting doubt on this theory is that the bullet which killed her was found beneath her head. The evidence could be viewed as preponderating that, more probably than not, defendant was lying, and he killed his mother and the rest of his family, but that is not the test. The burden of proof was on the state to prove guilt beyond a reasonable doubt by excluding every reasonable hypothesis of defendant's innocence. Considering the totality of the evidence corroborating his version as to how the homicides occurred, we are of the opinion that all reasonable hypotheses of his innocence were not excluded, thus preventing us from having that abiding conviction that it was defendant, and defendant alone, who killed his mother.
Accordingly, the conviction of Burl L. Parker for first degree murder is reversed.
REVERSED.
MARCUS and WATSON, JJ., dissent and assign reasons.
BOWES, J., dissents and will assign reasons.
WATSON, Justice, dissenting.
The only issue at trial was whether Izilla Parker, the mother of defendant, was shot by him or Wilbur Edwards. Although this prosecution was solely for the death of Izilla Parker, her daughter, Audrey Parker Bond, her estranged husband, the Reverend James Parker, and Wilbur Edwards were also shot that day.[1] Since all the witnesses to the crimes were killed, the State's case relied on circumstantial evidence.
According to defendant's sixteen page statement, which was admitted into evidence, the following events occurred during the homicidal episode:
Parker and Edwards had been at the sister's house from breakfast time until after the noon news. Edwards then showed Parker his mother's dead body and said he had also shot the sister. Wilbur Edwards, armed with a .22 caliber rifle and the sister's.32 caliber pistol, then put defendant in the sister's blue Datsun. The two went to Reverend Parker's church, picked him up, and drove toward Natchitoches and Coushatta. They came to Minden, went on toward Homer and arrived at Coney Lake. A struggle occurred. According to Parker's statement, he was able to grab the pistol and shoot Edwards, but when he came to his father was dead.
At approximately 8:00 P.M., Burl Parker called the Vernon Parish Sheriff's office from Hodge and said there had been a big killing and that he would be at the office in a few minutes. Shortly after 11:00 P.M., Burl Parker appeared at the sheriff's office with a superficial bullet wound in his left side. Both during the telephone call and at the sheriff's office, Burl Parker appeared calm and collected. Burl Parker's statement was that Wilbur Edwards had killed the other parties and that he had killed Edwards in self-defense. As he put it, "he shot them and I got him" (Tr. 208).
*691 The testimony which probably convicted Burl Parker was that of three witnesses who saw Parker, at approximately 1:30 P.M., driving his sister's blue Datsun at the intersection of the Old Slagle Highway, Highway 468, and the Alexandria Highway, Highway 28. The Pit Stop Grocery is located at that intersection. Wilbur Edwards was walking toward his friends at the Pit Stop when Burl Parker drove up in the blue Datsun. Burl Parker had never been seen driving his sister's car prior to that date. Edwards first looked in on the passenger's side of the car, gave a start and then got in on the driver's side. At approximately 5:00 P.M. the blue Datsun was seen coming out of a log road in the Kisatchie National Forest. Burl Parker was driving and stopped the car when a sheriff's car got even with it and remained in a stationary position while the sheriff's car proceeded approximately a quarter of a mile.
Because the testimony of the witnesses at the Pit Stop Grocery established that Wilbur Edwards probably had not been at the house and certainly had not forced Parker to leave the house in the Datsun, the jury concluded that it was Parker who killed his family. The evidence established beyond a reasonable doubt that it was Burl Parker who had been at the house that day, murdered his mother and sister, and taken his sister's car. There is no real doubt that Burl Parker is the guilty party.
I respectfully dissent.
MARCUS, Justice (dissenting).
The only other reasonable hypothesis, other than defendant did it, was that Edwards committed the crime. Because of the inconsistencies in defendant's account of what happened, I consider that the jury rejected that theory as being an unreasonable hypothesis. See State v. Austin, 399 So.2d 158 (La.1981). Viewing the evidence in a light most favorable to the prosecution, I consider that a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded.
Accordingly, I respectfully dissent.

ON REHEARING
WATSON, Justice.
In the original opinion, the conviction of Burl L. Parker for first degree murder was reversed, the majority concluding that the evidence was insufficient. A rehearing was granted to reconsider that conclusion as well as the other Assignments of Error. In oral argument and by letter brief, defendant's counsel has raised an objection to the full court's sitting on the rehearing, when the original opinion was rendered by a panel including three ad hoc judges. There is no merit to the objection, and it is overruled.
Defendant, Burl L. Parker, was convicted of first degree murder and sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:30. Defendant has appealed his conviction and sentence, assigning nine errors by the trial court.

FACTS
Burl Parker was convicted of killing his eighty year old mother, Izilla Parker, on July 17, 1977. According to the autopsy, death occurred at approximately 1:00 P.M. that Sunday. Although this prosecution was solely for the death of Izilla Parker, her daughter, Audrey Parker Bonds, her estranged husband, the Reverend James Albert Parker, and Wilbur Edwards were also shot to death that day.[1] The two women were shot in Vernon Parish and the two men in the Corney Lake area of Claiborne Parish. Burl Parker and Izilla Parker had been staying at the home of Audrey Parker Bonds near Leesville. Edwards sometimes stayed there and sometimes with the Reverend Parker in Slagle. Since all the witnesses to the crimes were killed, the State's case relied on circumstantial evidence.
*692 According to defendant's sixteen page statement,[2] S-6, the following events occurred during the two homicidal episodes:
Parker and Edwards had been at the sister's house from breakfast time until after the noon news. Parker was in the tool shed all morning. He heard a single shot. Wilbur Edwards appeared armed with a .22 caliber rifle and the sister's .32 caliber pistol. Edwards showed Parker his mother's dead body and said he had also shot the sister, but Parker did not see the sister's body. Edwards told Parker to bring another.22, one that was sawed-off, from the shed and then put Parker in the sister's blue Datsun. The two went to Reverend Parker's church at Slagle, picked him up, and drove toward Natchitoches and Coushatta. They came to Minden, went on toward Homer and arrived at Corney Lake. A struggle occurred. According to Parker's statement, Edwards was shooting at him with a .22. Parker was able to grab the .32 pistol from Edwards' waist and shoot Edwards before he fell unconscious. When Parker came to, his father was dead. Parker said that Wilbur Edwards had killed the other parties and he had killed Edwards in self-defense.
The issue at trial was whether Burl Parker or Wilbur Edwards killed Mrs. Izilla Parker.
The state's circumstantial evidence was as follows:
Shortly after 8:00 P.M., Burl Parker called the Vernon Parish Sheriff's office from Hodge and said there had been a big killing but he had gotten the boy and would be at the office in a few minutes. About 11:00 P.M., Burl Parker appeared outside the sheriff's office with a superficial bullet wound in his left side and a .32 in his hand. Parker said he had been shot. Deputy Sheriff Steven Rondina then:
"... asked him, after he told me he had been shot, I asked Mr. Parker if he could tell me where the shooting took place and how many people were dead and he told me, `No, I don't know. I picked up a hitchhiker. He forced us all in the car and made us drive to Caney [sic] Lake. There's at least three dead and maybe four.' ..." (Tr. 170)
During the telephone call and later at the sheriff's office, Burl Parker appeared calm, collected and rational. He spoke normally. In the trunk of the blue Datsun was a .22 rifle (S-7). The stock had been sawed off four inches from the trigger so that it could be fired with one hand.
Izilla Parker and Audrey Parker Bonds were found dead at the latter's home, which is located on Highway 28 about .3 of a mile from the intersection of that highway with Highways 8 and 468. According to the physical evidence at the scene, the body of the sister had been drug from the northwest bedroom to the back steps of the house and on to a point near the southwest corner. She was still alive and moving when she was left there. A bullet from the sawed-off.22 was on the ground. It had gone through her head. The body could have been seen from the open ended tool shed and would have been in view about halfway between the shed and the house. "[Y]ou couldn't hardly miss it." (Tr. 276) The hallway where the mother's body was found is adjacent to the northwest bedroom where the sister was shot. The mother was shot by the .32 Parker turned in at the sheriff's office.
On the day of the homicides, at approximately 1:30 P.M., five friends of Edwards were at the Pit Stop store at the intersection of Highways 8, 468, and 28. They saw Edwards walking north toward Slagle on Highway 8. He was shirtless, dressed in blue jeans, and walking very slowly. When his friends tooted, he turned back toward the Pit Stop. Audrey Parker Bonds' home is about .3 of a mile northwest from that intersection on Highway 28. Parker appeared driving his sister's blue Datsun toward the intersection. Burl Parker had never been seen driving his sister's car prior to that date. The blue Datsun turned at the intersection, "whipping in" (Tr. 363) "real fast" (Tr. 391) around the stop sign, *693 and pulled up by Edwards. Edwards looked in on the passenger side, clinched his hands, signaled rapidly to his friends behind his back and then walked around to the driver's side of the car. The car was facing toward Slagle and drove off in that direction. The Reverend James Albert Parker's house is about four miles from the intersection on Highway 8 in the direction the Datsun was driving after Edwards took the wheel.
Around 5:00 or 5:30 P.M., a Claiborne Parish deputy sheriff, Danny Lee, saw the blue Datsun coming out of a log road in the Corney Lake area of the Kisatchie National Forest. The sheriff's car slowed to about 15 miles per hour. Burl Parker was driving the Datsun and stopped when the sheriff's car got even with it. Parker remained in a stationary position while the other car proceeded approximately a quarter of a mile. Later that night, Lee and a companion found the bodies of James Parker and Wilbur Edwards in the area of the log road. Edwards was face down clutching a .22 rifle and James Parker was ten feet away. James Parker had been killed by a .22 caliber bullet. Which rifle fired the bullet could not be determined.
According to Billy Doherty, Wilbur Edwards was happy during the four and a half hours they were together at the Speedway races the Friday night before the murder.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends that the trial court erred in not granting a mistrial when the state referred to other crimes committed by defendant.
The four murders were inextricably intertwined. The entire sequence of events formed a continuous transaction and it would have been impossible to present the case to the jury without reference to the other murders. The res gestae of the murder of Izilla Parker included the other three murders. LSA-R.S. 15:448; State v. Edwards, 375 So.2d 1365 (La., 1981); State v. Haarala, 398 So.2d 1093 (La., 1981).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
Defendant contends that the trial court erred in admitting into evidence defendant's statements to Deputy Steven Rondino.
The inquiries by the police were investigatory and were not made in the context of a custodial interrogation. Parker was not placed under arrest and the police merely wanted to find out what had happened. There was no evidence that Parker was in pain from his flesh wound or that his statements were involuntary.
The statements were made freely and voluntarily.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant contends that S-2, a photograph of the dead mother, should not have been admitted into evidence because its inflammatory nature outweighed any probative value.
While the photograph is somewhat gruesome, it established the identity of the victim, the scene of the killing and the location of the fatal wound. The probative value of the photograph outweighed any prejudice. State v. Myles, 389 So.2d 12 (La., 1980).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Defendant contends that a mistrial should have been granted when Deputy Gary Dowden was asked if he had been involved in the investigation of the murder by Burl Parker.
The trial judge advised the jury that counsel should have referred to the "alleged" murder and comments by counsel do not constitute evidence. (Tr. 303) Although the prosecutor's question was improperly phrased, the trial judge's admonishment *694 cured any error. LSA-C.Cr.P. art. 771.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER FIVE
Defendant contends that the trial court erred in admitting S-7 [the sawed-off .22 rifle] into evidence because there was a missing link in the chain of custody.
The rifle was properly identified by Ray Heard, an expert in firearms identification, and Deputy Gary Dowden. Since the evidence was connected to the homicides, it was properly admitted in evidence.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX
Defendant contends that the trial court erred in admitting hearsay evidence by Billy Doughtery about a conversation with the deceased, Wilbur Edwards, on the Friday night before he died on Sunday.
Doughtery had already testified, during cross-examination by defense counsel, that Wilbur Edwards was going to get a divorce. The state, on redirect, was attempting to establish the basis for the testimony. The hearsay was merely cumulative of other evidence and harmless.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
This assignment contends that the trial judge erred in denying defendant's motion for acquittal at the conclusion of the state's evidence.
C.Cr.P. art. 778 does not allow entry of a judgment of acquittal at the close of the prosecution's case in a jury trial.[3] However, construing this assignment as a contention that the evidence was insufficient, it is necessary to review the facts as established by the record to determine:
"... whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Jackson v. Virginia, 443 U.S. 307 at 319, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 at 573 [1979], which is the federal or constitutional standard); and, since this is a circumstantial evidence case, whether, assuming every fact to be proved that the evidence tends to prove, every reasonable hypothesis of innocence is excluded (LSA-R.S. 15:438, the state or statutory standard). Thus, the questions are whether, considering the evidence in the light most favorable to the prosecution, the jury could reasonably conclude that it proves Parker's guilt beyond a reasonable doubt and whether the evidence excludes every reasonable hypothesis of innocence. The evidentiary facts to be considered are essentially the same.
The argument is that there is not enough evidence of Parker's guilt. However, a careful sifting of the record indicates a substantial number of facts tending to prove that Parker killed Izilla Parker. The evidence which points to Parker's guilt can be summarized as follows:
(1) Parker was in possession of the .32 pistol (the weapon which killed Izilla Parker) when he surrendered to a deputy sheriff about 11:00 P.M. on the date of the multiple killings.
(2) Parker admitted to being present at the scene of the homicide at 1:00 P.M., the time of his mother's murder.
(3) According to disinterested witnesses, Parker was in control and possession of his dead sister's blue Datsun vehicle at approximately 1:30 P.M.
(4) The only other person who could have committed the homicides, Wilbur Edwards, was strolling on Highway 8, unarmed, with no indicia of guilt, shortly after the approximate time of the mother's murder.
*695 (5) Parker's statement indicated that Edwards abducted Parker from his sister's house, while disinterested witnesses established that Parker picked Edwards up on Highway 8 about 1:30 P.M.
(6) Although Edwards had a room at the home of Audrey Parker Bonds, Parker, in his first oral statement, referred to Edwards as an unnamed hitchhiker.
(7) Edwards signaled to his friends after he looked in the blue Datsun; he may have been asking for help.
(8) After Edwards entered the Datsun as driver, the car drove away from the sister's residence and toward Parker's father in Slagle.
(9) A deputy sheriff of Claiborne Parish established that, contrary to defendant's declared purpose of seeking police assistance, defendant had every opportunity to hail or stop him about 5:00 or 5:30 P.M. but failed to do so.
(10) According to the physical evidence at the scene, the body of Parker's sister, Audrey, had been dragged from the northwest bedroom to the back steps of the house and on to a point near the southwest corner. She was still alive and moving when she was left there. The body could have been seen from the open-ended tool shed and would have been clearly in view about halfway between the shed and the house. Parker said he did not see his sister's body before leaving the house, which was improbable. The hallway where the mother's body was found is adjacent to the northwest bedroom where the sister was shot. The northwest bedroom was closer to the tool shed than the hall. More than one shot should have been heard by Parker. The jury could have found defendant's story that he worked in his tool shed all morning, aware of any untoward events until he heard a single shot and was confronted by the armed Wilbur Edwards, to be unbelievable.
(11) Defendant was in possession of the sawed-off .22 rifle which fired the fatal bullet through his sister's head. According to Parker's own story, he had this murder weapon in the tool shed when Edwards came in and said "I've killed them both." (Tr. 75)
(12) Parker displayed no emotion over the deaths of his mother, father and sister.
(13) The trip to Claiborne Parish took only three and one-half to four hours, including the time spent in picking up the Reverend Parker and in shooting Parker and Edwards; the return trip took five and one-half to six hours. Parker was in no hurry to confront the police.
These facts, considered in a light most favorable to the prosecution, are sufficient to justify a rational trier of fact in concluding that Parker's guilt was proved beyond a reasonable doubt, meeting the Jackson v. Virginia test.
Since the evidence against Parker is circumstantial, under state law it is necessary that the evidence exclude every reasonable hypothesis of innocence.
Under the factual circumstances, there are only two reasonable hypotheses. First, Wilbur Edwards killed the two women, then abducted Parker and his father, taking them to Claiborne Parish where Parker successfully seized the pistol and killed Edwards after Edwards had killed the father. The other is that Parker killed his mother and sister, abducted Edwards and the father, took the two to Claiborne Parish and killed them also.
The jury could have reasonably concluded that Parker or Edwards was the killer. Since Parker's story attempting to place the blame on Edwards was contradicted by many known facts (e.g., the witnesses who saw Parker pick up Edwards on the highway; Parker claimed Edwards abducted him) and was internally contradictory (e.g., Parker said the sawed-off .22 had been in the tool shed during the murders, but it killed the sister), the jury could have reasonably concluded that Parker concocted the story to hide his guilt. It must be remembered that Parker, who was admittedly present at the murder scene at the time of the killings, had the murder weapon in his possession when he belatedly surrendered to law enforcement officers.
*696 The facts do not support the hypothesis that Edwards shot the mother and sister, dragged the sister's still-living body outside the house without Parker seeing him, and then accosted Parker, who had been working all the time in the open-ended tool shed eighty feet from the house.
As observed by Justice Dennis in State v. Graham, 422 So.2d 123 (La., 1982):
"The possibility that the murder occurred in this way is reduced further by the facts inconsistent with defendant's theory which the evidence also tends to prove. In comparison with the prosecution's hypothesis of defendant's guilt, which is consistent overall with the evidence, the defendant's circumstantial theory of innocence is remote." 422 So.2d at 130.
When there are only two hypotheses as to who committed a murder and one is consistent with known facts and the other inconsistent, it can be concluded that every reasonable hypothesis of innocence has been excluded.
While it is possible that Edwards murdered Izilla Parker, the jury correctly found that this was not a reasonable hypothesis. See State v. Austin, 399 So.2d 158 (La., 1981).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
Defendant contends that the trial court erred in overruling an objection to the prosecutor's closing argument about penalty. "[T]he state of Louisiana, ..., is not seeking the death penalty, ...." (Tr. 439)
Defendant contends that this reference to penalty at the guilt stage of trial improperly influenced the jury's verdict. The jury was instructed, when the objection was overruled, that its decision should be based on the facts heard in the case. It is unlikely that the statement influenced the verdict. State v. Barrow, 410 So.2d 1070 (La., 1982).
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER NINE
Defendant contends that the trial court erred in reinstructing the jury after it had commenced deliberations, amending the jury charges, and thereby coercing a verdict.
The jury requested further instructions on the responsive verdicts. The trial court instructed the jury that the sheet which had been handed to them contained all the responsive verdicts and he could not instruct them further without agreement of counsel. Subsequently, after the jury again retired, the court decided that a section of the definition of second degree murder was missing and concluded that it was necessary to correct the error before the jury concluded its deliberations.
At the time of the crime, July 17, 1977, Act No. 657 of 1976 defined second degree murder as follows:
"Second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill."
This was the initial instruction given to the jury.
At trial in June of 1981, the definition of second degree murder had been enlarged by Act No. 74 of 1979 to read:
"Second degree murder is the killing of a human being:
"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
"(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm...."
*697 The court concluded that it was necessary to charge the jury with Subparagraph (1) of the statute as it read at the time of trial:[4]
"When the offender has a specific intent to kill or to inflict great bodily harm;..."
There was a defense objection on the ground that there was no statutory authority for further instructions and adding to the charge might coerce a verdict of that responsive charge. The court nonetheless gave the additional instruction.
The official revision comment under C.Cr.P. art. 808[5] notes that the article does not authorize the court to recall the jurors after they have retired to deliberate to give them additional or corrective instructions. Thus, there was no statutory authority for a corrective instruction.
The jury did not return the verdict on which they were reinstructed and found defendant guilty of first degree murder. Moreover, the second degree murder charge given by the trial court was more favorable to the defendant than the one in effect at the time of the crime. It would have allowed the jury to return a verdict of second degree murder even if the jury found that defendant had the specific intent to kill or inflict great bodily harm. Thus, the trial court's action was not prejudicial. See State v. McMahon, 391 So.2d 1120 (La., 1980).
This assignment lacks merit.
For the foregoing reasons, the original opinion of this Court is recalled and vacated, and the conviction and sentence of defendant, Burl L. Parker, are affirmed.
AFFIRMED.
DIXON, C.J., dissents.
BLANCHE, J., dissents for reasons assigned on original hearing.

APPENDIX
"DATE 7/27/77 TIME 9:23 A.M. PLACE VPSO
"I, Burl L. Parker, am 61 years of age and my address is 8 miles east on Hwy. 28 Leesville, La General Delivery. I wish to make the following statement: WE (sic) got up Sunday morning I had not worked Sat. Wilbur Edwards was staying with us had hired me to make him some what nots and gun racks. After breakfast I went out to the shop and I started working on the pieces. During the morning Wilburn (sic) Edwards washed my sisters car and polished it and he hollered and told me that he was going to use Audrey's car tonight. He drove the car after finishing it up to the front of the house I worked on until noon. I have a radio out at the shop and I listened to the news at noon and I had not seen the boy any more since he drove the car up to the front. I was working at the shop and did not go into the house to eat lunch. I do not know what time it was that I was working but I was trying to finish the piece I was working on. All of a sudden Wilbur Edwards appeared at the shop. He had a pistol in his pants and my automatic 22 and my dog (vecious) (sic) came after him and he killed my dog and then he said to me you'll get the same thing if you don't shut your mouth and come with me and do exactly as I tell you to do. He took me in the house. In the shop where I was working there was a sawed off 22 that Wilbur had bought from me and when we left the shop he told me to bring this 22 and we tossed it in the car and then he took me on in the house. Then he showed me my mother he said I've killed them both. I didn't see my *698 sister. Then he asked me where her cartridges were to that pistol I told him that I didn't know where she kept them at. He said you find them. So I looked I opened some drawers and looked on the dresser and I couldn't find them I dont (sic) even know if she has any more. He said come on we'll go into your room and as we passed over my mother the telephone was laying on the floor and he turned back around and told me to straighten up the telephone which I did. Hetook (sic) me into my room he asked me where my other ammunition was to my 22 for he had already got one box of ammo that was setting out on the table and he knew I had another one. I told him it was in a vanity case where I kept my medicine. He told me to take the vanity case and get my shoes on and I couldn't find my shoes he said come on. We went back out to the front went to the car he said now we are going over to the church house where my dad was. He put me in the car and when we got to the church house my Daddy was sleeping on a couch in the church house. He snatched or ripped the door open and then was when he began to tell my Daddy that they had all double crossed him with his wife. On the way over to the church he told me keep your mouth shut don't you tell Daddy that I have killed them and my Daddy died and never did know it. He told my Daddy to get up and put his shoes on and he told him that he was going down to kill Shirley his mother-in-law and his wife. My Daddy pleaded with him not knowing what he had already done he pleaded with the boy. He said if you would have told me in time this all wouldn't have happened said the girl would not have left me and I wouldn't be in this position. He said you all double crossed me with my wife that is the reason she is gone. We stayed about 10 minutes and my Dad was arguing with him and he turned to me and said Burl if you want him to live you better bring him out of her (sic) and make him go on with us. When he got to that point I told my Daddy the best thing you can do Daddy is go on with him and talk to him and maybe you can talk him out of this. Well he had told me to keep my mouth shut and to talk only when he talked to me. He took us out to the car with the double barrell shotgun and broke the gun down and put it in the back of the car. He had first tried to put the shotgun down behind the seat but it would not fit in the little car it stuck to (sic) far out. Then he made us get into the car and he drove put me in the back seat my Daddy in the front with him. Then we went on to Simpson and my Daddy pleaded with him all the way to think about it he said take a little time think about this Wilbur. We were on the way to Alexandria when we got to Simpson he turned to the left going towards Kurthwood went out through Kurthwood on to the Natchitoches road. He said I know some people in Natchitoches I've been working down there and went to school down there. Then he gets out and has me to drive after going way on close to Natchitoches he decided he didn't like my driving he has us to change again. We were real thursty (sic) and when we got into Natchitoches went over the bridge to the river and under that river there is a beer joint where you can drive up to the window he bought beer and cokes. Then we go on to some cut off farm roads that goes into the Shreveport Hwy. I can't think of the name of these roads but he goes on towards Shreveport and we came to a sign that said Martin and Coushatta he turned off that road goes a good long ways on that country road and he turned on another road going towards Coushatta. He said he had to get gas so we went to what I believe is a 66 station and he said Burl you got any money and I said yes.
He said I don't have my billfold. He asked my Daddy if he had any money and he said yes $3.00. My daddy gave him the $3.00 and I paid for the gas with a $5.00 bill and got the change back. Then we drove on towards Shreveport. He comes to a farm road and turns to the right before you get to Shreveport. Then we passed through a place called Haughton is the way it is spelled I believe. Then we turned to the right at the I 20 near Minden and drove throught (sic) Minden he drove around a while in Minden and said he had some *699 friends he wanted to call in Minden but never made the call. Then he hit a road going out towards Homer and he was real thursty (sic) again. I told him that I knew the country and there was a little fountain in a little park if it was still there and we could get water there. He filled up the coke bottles there. We went on through Homer and he said where is that Eldorado Hwy. So we came to a cross road he said this is it I'm on the right road. We traveled all evening it was getting late in the evening. We passed through Summerville and were coming close to Coney (sic) Lake and I told him I said Wilbur I know where there is a spring here and I told him to go down where they fish but he didn't want to get in a crowd so he said no we're not going down there. Then I told him about ½ mile on the right you can go up over that hill and there is an old spring and we could fill up the bottles there and rest a while. We turned off because he agreed to do that we went up this long hill a ruff (sic) old road and he began to get impatient with me before we got there he told me I wasn't doing anything but leading him on a wild goose chase. My Dad said no Wilbur maybe the spring is still there let's take a chance on it.
We reached the top of the hill to where we couldn't go any further with the car and he turned the car around. And my Daddy got out we all got out my Daddy sat down on the edge of the road at the side with a water bottle and the boy said there is no spring here there is no such of a thing and I told him if he would go with me that the spring was just a couple hundred yards down the hill he began to get angry because he didn't think there was a spring there. He said I'd be better off by myself I'll just kill the whole bunch and go on by myself. I was standing between him and my Daddy my Daddy says Wilbur you know you wouldn't do any such thing as that just pleading with him he says well why don't the two of you go on down and see about the spring I can't walk back up that hill I'm too old Wilbur kept raving about the double cross and said if you had told me time this would not all happen he said if you had told me in time and I don't know what he meant by that. They were arguing about Daddy knowing that Wilbur's wife was going to leave him and sue him for alimony and then something about Wilbur's baby being in the hospital with meningitis and he accused them of keeping something from him about child beating and he told Daddy you know that baby had meningitis. Then he became violent and stepped toward us and stuck the gun toward my stomach and he shot. This gun was the 22 automatic. But he didn't hit me the first time. He had his pistol in his bosom here a 32 revolver. Then I caught his hand and I began to fight with my right hand. And then he shot two or three more times and one of the bullets hit me and I went to my knees still holding to the rifle and I saw the pistol I grabbed the pistol and come back up and he hovered over me and as I came back up I shot he slumped forward and I shot again. Then he fell on me. Then I began to have dark spots and fainting spells and ringing in the ears and I said I must be dying and I laid there I don't know how long maybe a short time I don't know how long but when I came to I laid real still and nothing was moving and I said no I'm not dead and I jumped up and his leg was across me and then is when I looked around and saw that my Daddy was dead and I looked at him again and I say (sic) that he was dead. I picked up the pistol and got in the car and drove down the hill to get help and when I came down the hill before going into the big road I had stopped to vomit and I looked up and I saw a Sheriff's car pass right in front of me and go on I know he saw me because he slowed up. I said I'll catch him this is my lucky day by the time I got down the hill and to the road he had gone around the curve and I didn't catch him. I drove on down the road and came to a church and they were ganging up around the church door. I said first telephone I come to I'll stop and call in and I began to get sick with this wound. I came to a town named Bernice and it was getting late and I said maybe I should stop here and see about getting a doctor and call from here. The *700 down (sic) was dead and there was no movement so I drove through and said I'll make it to the next town. Then as I went through the next town I said the best thing to do is wait till I get back down there where it started and turn my self in and get the hole (sic) thing from the beginning where it started. I kept driving and driving until I found a telephone in front of a supermarket at HOdge (sic) and I stopped and I called in to the Sheriff's Dept. here and there was a deputy answered named Davis and I reported to him I said Mr. Davis this is Burl and I told him what happened what the boy had done what I had done that I had to kill the boy and that I was on my way back I said you know the boy they are all up there on the hill go out there and see about them. I said you know where I live he said no I don't know where you live which Davis do you want to talk to I said isn't this D. Davis and he said no and he put D on the telephone and I told D what had happened and I would be in in a few minutes. I said a few minutes but I was mistaken and it was further (sic) away than I thought. I don't know what time it was when I got in but I drove and drove and drove and when I got here D was done gone. When I got here they already knew that I had told them that I had killed the boy and I told them again and told them that he had killed my Daddy and my mother he had told me he had killed my Mother and he had showed her to me. They said when I had the gun the little pistol. They said is that the gun you killed him with and I said yes and laid it on the counter. Then they questioned me and took me on to the hospital told me they would have to hold me for investigation they gave me a perscription (sic) at the hospital and I have been taking antibotic (sic) pills since that time.
"Q. While you were working in the shop had you been using any tools?
"A. Yes
"Q. What tools did you use?
"A. A drill and a saber saw and a sander.
"Q. What kind of sander was this?
"A. It goes on the end of a drill
"Q. Was your radio on?
"A. I don't know I had listened to the news but I don't know if it was on.
"Q. Was your dog in the shop with you?
"A. My dog was in a side pen and the gate was open the pen was two little side pens on each side of the shop.
"Q. When Wilbur shot your dog what did he do the dog what did he do?
"A. The dog ran back into the pen and Wilbur shot him again and I never did here (sic) the dog again
"Q. Where was the car located at this time?
"A. At the front side. The car was setting up at the front of this little road under the shade near the corner of the fence.
"Q. Who did this 32 caliber (sic) pistol belong to?
"A. To my sister
"Q. Do you know where she kept it?
"A. No
"Q. Would you explain how you straightened up the telephone?
"A. I reached down and it was under my mother the wires were under my mother and I straightened it up and put the receiver on it.
"Q. On what table was this 22 caliber (sic) of ammo sitting?
"A. One box was sitting behind the TV but he had already got that box?
"Q. How do you know he had ready got that box?
"A. Because he told me
"Q. When you all went to the car who drove?
"A. He drove he first told me to drive then he changed his mind.
"Q. App. what time was this?
"A. Sometime after dinner I don't know but after the news.
"Q. Your (sic) sure that you left the house and Wilbur drove?
"A. Yes
"Q. When you got out to the church was the door latched?
*701 "A. Yes
"Q. When you left the house what guns did he carry with him?
"A. The little sawed off gun, my rifle and my sister's pistol.
"Q. What guns did he get at his residence?
"A. The double barrel shotgun
"Q. When you all left the church what positions were you all sitting in in the car.
"A. He drove I was in the back and Daddy was sitting in the front with him.
"Q. What guns did he have on him at this time?
"A. He first tired (sic) the shotgun and it wouldn't fit and he broke it down and put it in the back and the little sawed off gun was on the floor in the front and the pistol was in his pants.
"Q. What about the 22 rifle?
"A. On the side between him and the door
"Q. How was Wilbur dresses (sic)?
"A. He had on an old stripped (sic) shirt open with no sleeves and my old shoes, and blue jeans.
"Q. Did he have a belt?
"A. I don't remember it doesn't seem like it but he might have.
"Q. At any time during this long trip don't you think that you and your Dad could have got a hold of him while he was driving?
"A. I considered that but my Daddy didn't know what he had done and my Daddy could talk back to him and he had told me several times to keep my mouth shut and my Daddy was hard of hearing and you had to holler at him.
"Q. How many stops did you all make between your house and Homer?
"A. About 6 stops best I can remember
"Q. Did any member of the family own a single barrel shotgun 12 gauge?
"A. Yes an old one hanging on the wall
"Q. Was any other kind of guns on the premises besides what you named?
"A. Yes
"Q. What kind
"A. A 12 gauge shotgun in my locker that doesn't shoot
"Q. What did Wilbur do with the $3.00 that you (sic) Dad gave him?
"A. I don't know
"Q. How much money did you have when you started the trip?
"A. $85.00 or $90.00
"Q. Did he know that?
"A. He should have because he had paid me some money for some work.
"Q. Did you stop on the way back for gas and how many times?
"A. Yes one time after I had called you all I don't remember how much
"Q. Where this Phillips 66 station at?
"A. I think it was 66 in Croushatta (sic)
"Q. How did you know where these springs were?
"A. I lived in that area and had fished these springs for 30 years.
"Q. Did you ever live in Lincoln Parish?
"A. Yes in Downsville
"Q. Do you know the police officials in Ruston?
"A. Yes quite well
"Q. Did you come through Ruston on the way back?
"A. Right through there
"Q. Does your sister have a camp on Corney Lake?
"A. Not that I know of
"Q. In what town were you when you made the phone call?
"A. Hodge
"Q. How much money did you deposit in the telephone?
"A. five (5) quarters
"Q. How long did you talk?
"A. I don't know I talked to the first Davis a good while and then I talked to D. Davis.
"Q. How many minutes would you say you talked?
*702 "A. I don't know
"Q. How far above Minden or Corney Lake is Hodge?
"A. I don't know it would be about 40-50 miles
"Q. When you came out on the road and saw the Sheriff's car pass you went and tried to catch him.
"A. Yes but he went around the curve and I never did catch him he surely must have turned off.
"Q. When you grabbed this rifle which hand did you grab it with?
"A. The left
"Q. When you were holding the rifle and you saw the pistol you picked it up and shot him?
"A. After he shot me and we wrestled I fell to my knees and he was hoovered (sic) over me and I grabbed the pistol and shot straight up and he slumped over. When I shot I was on my knees coming up after I grabbed the pistol and I started shooting as I was coming up and he was slumped over me with the rifle shooting.
"Q. Are you left or right handed?
"A. Right
"Q. Earlier you stated to me that you shot Wilbur in the face
"A. I saw this after I got up I don't know exactly where the blood was everywhere
"Q. When he started this shooting what position were all of you at?
"A. I was standing between my Daddy my Daddy was sitting on a stump behind me he was facing us Daddy and I were both facing Wilbur.
"Q. Do you drink
"A. No sir
"Q. Did Audry and your mother and father get along well?
"A. There seemed to be some friction.
"Q. Did Audrey date anyone?
"A. I don't know there was a man came a couple of times that looked about maybe 50 from where I was sitting
"Q. Did you (sic) sister at Oakdale visit here often.
"A. She used to she hadn't been up in 6 weeks to 2 months.
"Q. Did your parents show partiality between the children?
"A. No
"Q. How fast did you drive on the way back?
"A. The limit and sometimes more 55-60
"Q. How many stops did you make on the way back?
"A. I made the telephone call, I stopped for gas and one other time?
"Q. Where was the third stop?
"A. Somewhere on the road to releave (sic) myself.
"Q. When you all stopped on this bridge to releave (sic) yourselves did you releave (sic) yourself at this time?
"A. Yes
"Q. Did you drink anything prior to this
"A. I drank Coco cola (sic)
"Q. How much water would you say you drank?
"A. About normal but when I get excited I drink more water.
"Q. Did Wilbur have many friends his age and did they visit him?
"A. I didn't see anyone
"Q. Were you all planning a fishing trip?
"A. No
"Q. Did Wilbur put the camper on the truck Saturday?
"A. It would have been on Friday because I don't work on Saturday because I'm a Seventh Day Advantist (sic) and I had helped them.
"Q. Who did most of the cooking at your house?
"A. Everyone did there (sic) own because they ate some meats that I don't eat.
"Q. What kind of meats do you eat?
"A. I don't eat pork I like beef
"Q. Did you all have watermelon Sunday morning?
*703 "A. I ate some that morning early that morning.
"Q. Had you already eat (sic) breakfast.
"A. I ate breakfast and a piece of watermelon and went on to work.
"Q. Did you attend you (sic) Daddy's church?
"A. Not one time
"Q. Did you and your dad ever have discussions or argument over religion?
"A. No they debated and discussed scriptures.
"Q. Was there any friction between Mr. and Mrs. Parker?
"A. IT (sic) is a known fact that there was friction between them.
"Q. Do you like tea?
"A. Yes hot tea quite a bit I drink hot tea every morning.
"Q. Did you do quite a lot of Bible research and study?
"A. Yes
"Q. Are you quite knowledgable (sic) on the Bible?
"A. To my satisfaction
"Q. Do you scribble on these wrappers off of tea bags?
"A. Yes
"Q. What does exactors mean?
"A. It would be put under pressure or extortion
"Q. Have you ever been in a mental institution and if so where and when?
"A. Yes, Jackson in the later part of 1958 for about 4 months from Nov 1957 till April in 1958
"Q. Do you know a Martinez?
"A. Yes, the only one I know was my cell mate here in Vernon Parish.
"Q. Did you all confide to each other while you were in jail?
"A. Religiously I advised him
"Q. Have you ever been accused of beating somebody?
"A. No accusations in law but 3½ or 4 years ago a girl out at Simpson and I had a roow (sic) in my front yard and the State Police came and picked her up when I called them but no charges were made.
"Q. Have you ever hit your mother or Audrey?
"A. Not my mother but Audrey and I had a scuffle about 10 or 15 years ago.
"Q. Have you ever pulled a gun or been accused of pulling a gun on anyone else.
"A. Not officially
"Q. Was your Mother, Father and Audrey trying to put you back in a mental institute?
"A. No not that I know of
"Q. Has Audrey or your Father or Mother ever been in an institute or the Edwards boy?
"A. No not that I know of
"Q. Do you have good knowledge of weapons?
"A. Not all that much
"Q. Would you say that you are an expert shot?
"A. I was an expert shot in the Army 40 years ago.
"Q. What is your favorite weapon?
"A. I gues (sic) a shotgun because I like to squirrel hunt.
"Q. Did Edwards practice with weapons?
"A. I don't know
"Q. Is there anything you would like to add to this statement?
"A. I have given you the facts as far as I can remember them if there is anything left out I don't know at this time.
"I have read this statement consisting of 16 page(s) and I affirm to the truth and accuracy of the facts contained therein.
"This statement was completed at 11:31 A.M. on the 22nd day of July, 1977.
 /s/ Burl L. Parker
"/s/ witness
"/s/ witness."
NOTES
[*] Judges Fred S. Bowes, Nestor L. Currault, Jr., and Edward A. Dufresne, of the Court of Appeal, Fifth Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice Dixon and Associate Justices Marcus, Blanche and Watson.
[1] It was rumored in the community that Edwards was also a son of the Reverend Parker.
[1] It was rumored in the community that Edwards was also a son of the Reverend Parker.
[2] The complete text of the statement is included as an appendix to this opinion.
[3] C.Cr.P. art. 821 now provides for a post-verdict judgment of acquittal as a result of the passage of Act No. 144 of 1982.
[4] "All right, for the record, gentlemen, it's my intention to call the jury ... evidently there was omitted fromthat's on Page Eight omitted from the definition of Second Degree Murder Subparagraph One, when the offender has a specific intent to kill or to inflict great bodily harm, and I feel it necessary to correct that before the jury concludes its deliberations by including that sentence. Now, counsel, I understand that you're going to object to that, is that correct?" (Tr. 442)
[5] LSA-C.Cr.P. art. 808 provides:

"If the jury or any member thereof, after having retired to deliberate upon the verdict, desires further charges, the officer in charge shall bring the jury into the courtroom, and the court shall in the presence of the defendant, his counsel, and the district attorney, further charge the jury. The further charge may be verbal."