430 So.2d 627 (1983)
STATE of Louisiana
v.
Henry HARPER. (Two cases)
Nos. 82-KA-0764, 82-KA-0763.
Supreme Court of Louisiana.
April 4, 1983.
Dissenting Opinion May 9, 1983.
*629 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Tommy Adkins, Dist. Atty., Dan J. Grady, III, Asst. Dist. Atty., for plaintiff-appellee.
Robert E. Shadoin, Shadoin & Bleich, R. Wayne Smith, Walker, Holstad & Smith, Ruston, for defendant-appellant.
CALOGERO, Justice.
Defendant Henry J. Harper was charged by grand jury indictment filed May 12, 1981, with two counts of aggravated rape, two counts of attempted first degree murder, one count of armed robbery, one count of aggravated kidnapping, one count of aggravated burglary, and one count of attempted aggravated rape. The charges arose from a series of events which took place in a single incident involving the defendant's illegal entry into a trailer residence and offenses against Pam Spinks and her sister Martha Spinks.
On May 15, 1981, Harper pled not guilty and not guilty by reason of insanity to all charges. The Sanity Commission report filed on October 2, 1981, concluded that Harper was legally sane and capable of assisting in his defense. On November 25, 1981, a hearing on a Motion to Suppress was held and the matter taken under advisement by the court. At that time, the defendant withdrew his plea of not guilty by reason of insanity and changed it to not guilty to each charge. On November 30, 1981, defendant's trial for the attempted first degree murder of Martha Spinks commenced (our Docket No. 81-KA-0764). A jury was selected from the "Special Petit Jury Venire."[1] The trial continued on December 1 and 2, 1981, with the jury finding Harper guilty as charged on the afternoon of December 2.
At approximately 2:50 p.m. on December 2, 1981, and immediately after the jury returned its verdict of guilty for the attempted first degree murder of Martha Spinks, Harper's trial for the attempted first degree murder of Pam Spinks began. (Our docket no. 82-KA-0763). Harper's pre-trial motions for a continuance, for a change of venue, and to quash portions of the indictment including the instant charge were denied, or judgment deferred. Jury selection then began from members of the "Special Petit Jury Venire" who had not served in the prior trial of Harper and who had not been excused. Voir dire was completed on December 3, 1981. At the conclusion of the second trial on December 4, 1981, the jury found Harper guilty as charged by an 11-1 vote.
On January 29, 1982, Harper was sentenced to fifty years at hard labor for the attempted first degree murder of Martha *630 Spinks. He was also sentenced to a consecutive fifty year term for the attempted first degree murder of Pam Spinks. Harper now appeals both of his convictions.
In the appeal of his conviction and sentence for the attempted murder of Martha Spinks (No. 82-KA-0764), the defendant argues that the trial court erred in denying his motion to suppress the several taped statements that constitute his confession, and that the trial court erred in denying his motion for a mistrial made during testimony of a state witness. Relative to his conviction and sentence for the attempted first degree murder of Pam Spinks (No. 82-KA-0763), the defendant argues as in his other appeal (No. 82-KA-0764) that the trial court erred in denying his motion to suppress his taped statements made to police officers. Additionally in this latter case, the defendant argues that the trial court erred in denying his motion to quash the indictment based on double jeopardy grounds,[2] in denying his motion for a continuance and motion for a change of venue, and in denying defense challenges for cause of prospective jurors who testified that they had read or heard of the outcome and verdict of the first trial.
We find no merit in his two assignments relative to the conviction and sentence for the attempted first degree murder of Martha Spinks and affirm them accordingly (No. 82-KA-0764). However, because we find merit to his contention in No. 82-KA-0763 that his motion for a continuance or for a change of venue should have been granted in the second trial, which followed closely on the heels of his conviction in the first trial, we reverse that conviction and sentence.
The facts involved in the two cases are as follows.
To procure some stereo equipment, allegedly, the then twenty-two year old Harper entered the empty Spinks trailer in the early evening of April 5, 1981, by breaking in a bedroom window. Soon thereafter, Pam and Martha Spinks returned, entered the trailer and began preparing dinner, or going about other domestic chores. Harper hid under the bed in the bedroom at first. Then he entered the kitchen, grabbed Pam by the hair as she passed and dragged her toward the bedroom. As he passed the bathroom he grabbed Martha as well, who was dressed only in her underwear, preparing to take a bath. Once in the bedroom, Harper tied Pam with a telephone cord. Then he took Martha into the living room where he tried to force her upon the couch and remove her underwear. A struggle followed during which Martha was stabbed, was beaten on the head with a Coke bottle, and had her head forced under water in the bath tub as Harper tried to silence her screaming. At some point in the struggle, Candy Spinks returned to the trailer with her boyfriend. At their approach, Harper released Martha and ran to the bedroom where Pam Spinks was bound. He stabbed her twice in the back, broke out a window in the bedroom, and fled. He was seen running from the rear of the trailer and into the adjacent wooded area.
A short time later on the campus of a nearby university, a vehicle was stopped which was occupied by an individual sought by the police on other charges, and a passenger who fit the description provided police by the Spinks' sisters. Harper, the passenger in the vehicle, wore clothes similar to those described by the Spinks' sisters, had fresh blood on his clothing, a bloody pocket knife in his pants pocket, and a fresh cut on his hand. Harper's fingerprints matched prints found on the exterior and interior of the Spinks' trailer.
*631 At the time of Harper's arrest, one interview took place between the defendant and two Ruston police officers, during which Harper indicated that he wanted to talk to an attorney before giving a statement relative to the events of the evening of April 5, 1981. The interview was terminated shortly after defendant's request to talk to an attorney.
On the morning of April 7, 1981, investigating officers received word from City Jailer Fred Cowan that Harper wanted to speak to them. Harper was brought to the investigators' office and interviewed. Later that morning, he appeared in court for appointment of counsel. In the afternoon, before there had been any personal contact between defendant and his appointed counsel, defendant again requested an interview with the investigating officers. Additional statements were taken. In the morning statement, Harper admitted the burglary of the Spinks residence, but stated that when the girls returned home he hid under a bed and did not remember anything thereafter until he awoke in a wooded area, bleeding from his hand. In the later statements, Harper fully admitted the events at the Spinks residence. All were recorded on audiotape, and the statement taken on the morning of April 7, 1981, was videotaped as well. At the two trials, these recordings were edited to remove minor references to matters to which defense counsel objected. The videotape was played for the jury with the sound off, and the edited audio recording was placed on a separate machine at the same time during presentation of that particular statement.

Assignment of Error No. 1

Motion to Suppress (82-KA-0764, 82-KA-0763)
By this assignment in both cases Harper contends that the trial court erred in denying his Motion to Suppress his oral statements. Defendant claims that during his first statement on April 5, 1981, he asserted his right to counsel, after which the interrogating officers continued to question him. This statement was suppressed in part by the trial judge out of an "abundance of caution", beginning with Harper's response that he was not willing to answer questions at that time without a lawyer present.[3]
The other statements taken from Harper on April 7, 1981, were all attacked on the grounds that they were taken in violation of Harper's expressed desire to speak with counsel, and that they resulted from coercive tactics on the part of the police. We find that evidence taken at the hearing on the motion to suppress rebuts these allegations.
Harper alleged at the suppression hearing that between his arrest and his statements on April 7, Officers Kay and Kavanaugh came to see him in the jail several times at night, yelled at him and promised that things would go easier on him if he confessed. Early the next day the officers allegedly showed him pictures of the crime scene and interrogated him further. Harper stated that when he again requested a lawyer during the interrogation, he was struck on the head by Kay. He was also allegedly threatened with execution, or a long sentence, if he did not give a statement.
Roland Kay, inspector with the Ruston Police Department, testified that Harper was advised of his Miranda rights at the time of his arrest at 8:25 p.m. on April 5, 1981. At that time Harper indicated clearly that he was not willing to answer questions without a lawyer present. Despite this, Kay asked Harper a few more questions, received no inculpatory answers and then ended the interview. According to Kay, Harper then sent word on April 7th through his jailer that he wanted to talk. Between April 5th and April 7th, Officer Kay knew of no one's making any threats or promises to Harper. Kay had passed Harper's cell but did not interrogate him during the day and a half between statements.
*632 James Kavanaugh, another Ruston police officer, confirmed that on April 5th Harper was advised of his rights before talking with him and Kay. Unlike Kay, Kavanaugh did not ask any more questions after Harper asserted his right to counsel. Between April 5th and April 7th, Kavanaugh fingerprinted Harper at the jail but did not interrogate him. Kavanaugh likewise verified that Harper on April 7th requested through the jailer that he be allowed to talk to the investigators. Harper was brought to the investigator's office and again advised of his Miranda rights. He thereupon gave a statement at about 11:30 a.m. Another request came from Harper for a meeting with the investigators at about 4:00 p.m. the same day. He was returned to the investigator's office and again advised of his rights at the outset of a 4:30 p.m. statement and at the outset of a 5:45 p.m. statement.
At no time on April 7th did Harper indicate that he wanted to see an attorney. Instead he stated that he would make his statements without seeing an attorney and he executed individual waiver of rights forms prior to each statement indicating he did not want an attorney present. The transcripts themselves reveal that Harper was fully and separately advised of his rights before each statement and he specifically stated in the course of his last three statements that he was giving them freely and voluntarily and that he had knowingly waived his rights. Defense counsel had been appointed by the afternoon of April 7, 1981.[4] Harper was aware of the appointment and still expressed his willingness to give a statement without the presence of that counsel.
The jailer, Frederick Cowan, testified that on April 7, 1981 after Harper requested and made one phone call, he asked to see the investigating officers without suggestion by anyone. Jailer Cowan specifically denied any knowledge of ill treatment towards Harper, although he did say that Harper had told him of beatings and fears which were otherwise uncorroborated. Mr. Cowan also testified that Harper exhibited no physical evidence of mistreatment.
The Chief of the Ruston Police Department, Bruce Thompson, was present during the taking of the second and third statements from Henry Harper, and confirmed at the suppression hearing that the defendant had not been interrogated between the April 5th and April 7th, that no threats or coercion were used to obtain the statements, and that the defendant was fully apprised of his rights before talking about the events for which he had been arrested.
Robert Sharp, an attorney appointed by the court to serve as Harper's counsel,[5] also testified at the suppression hearing. Mr. Sharp had not been present in court on April 7th and became aware of his appointment by written notification placed in his mailbox at the Clerk of Court's office and picked up by his secretary later in the afternoon. He testified that he first met with the defendant on April 8th, at which time the defendant informed him that he had made several statements the day before to police officers concerning the trailer incident.
As indicated earlier, despite a belief that Harper's responses were more exculpatory than inculpatory, the trial court "out of abundance of caution" suppressed that portion of the first statement made on April 5th after defendant's assertion of his right *633 to counsel. Regarding the oral statements of April 7th, the trial court found that Harper had initiated contact with the officers and that he knowingly and voluntarily waived his rights including the right to counsel before to making those statements.
The statements of an accused, whether exculpatory or inculpatory, when made during a custodial interrogation should be suppressed unless the accused is first advised of, and subsequently waives his right to remain silent and his right to counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When an accused asserts his right to counsel the police must scrupulously honor the invocation of the right and interrogation must cease. State v. Thucos, 390 So.2d 1281 (La. 1980); State v. Manning, 380 So.2d 46 (La. 1980).
However, a majority of this Court has concluded recently that the question of whether an accused's rights are "scrupulously honored" depends on the totality of the circumstances involved in the particular facts of each case. One factor to be considered is who initiates the further questioning. Other factors include "the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right to counsel and the subsequent interrogation." State v. Shea, 421 So.2d 200 at 209 (La.1982), (on rehearing). See also State v. McCarty, 421 So.2d 213 (La.1982).
In the instant case, the continued questioning of Harper by Officer Kay on April 5th after Harper had asserted his right to counsel was clearly impermissible. The trial court therefore correctly suppressed those remarks made by the defendant on April 5th after he indicated that he would not answer any questions "at this time without a lawyer present." Miranda, supra.
Concerning the admissibility of statements made after a defendant asserts his right to counsel during police interrogation, Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) found inadmissible a defendant's statement made after such an assertion when coupled with the officers' initiation of further questioning. The statements in the instant case were made before the Edwards decision. A majority of this Court found that Edwards v. Arizona should not be given retroactive application. State v. Shea, supra; State v. McCarty, supra. In any event we also conclude that Harper himself reinitiated the interrogations knowingly and voluntarily. Accordingly his April 7th statements would be admissible even under the mandate of Edwards v. Arizona, supra.
The admissibility of a confession in the first instance is a matter for the trial court and its determination will not be disturbed unless not supported by the evidence. State v. Burkhalter, 428 So.2d 449 (La.1983). The testimony of police officers at the suppression hearing attest that Harper reinitiated the contact between him and the officers on April 7. Each of the April 7th statements were prefaced by a reading of constitutional rights to Harper and Harper's knowing and voluntary waiver of those rights, including the right to counsel. The record contains copies of the waiver forms. The transcripts and the tapes themselves reveal that Harper was advised of his rights and waived them.
Moreover the testimony of Kay, Kavanaugh, Thompson and Cowan rebuts Harper's specific allegations of abuse and threats in the interim between April 5 and 7. The judge accorded greater weight to the testimony of the police officers and jailer. We find that the trial court did not abuse its discretion in so crediting that testimony over that of the defendant, who alleged that the statements had been obtained only as a result of coercive tactics by the investigators. State v. Serrato, 424 So.2d 214 (La.1982). Additionally, in considering the important question of the voluntariness of the defendant's statements, *634 we, as the trial court before us, had the benefit of reviewing the several audio and especially the one video/audio-tape of the defendant's interview of the morning of April 7th during which he first made inculpatory statements. We were impressed with the calm, non-coercive environment, the relaxed attitude of the defendant, the courteous treatment he was afforded, and the voluntary character of the defendant's responses.
The totality of the circumstances, as set forth in the record, shows that Harper's right to counsel, as to his April 7th statements, was scrupulously honored under the Shea standards, that Harper himself reinitiated contact with the police and that Harper waived his rights prior to giving the statements. Therefore the statements on April 7 were "... sufficiently an act of free will entirely purged of and independent of the primary taint." State v. Davis, 336 So.2d 805 (La.1976).
Finally, the fact that the defendant had an appointed attorney with whom he had not conferred does not invalidate his April 7th afternoon statements. This Court has said: "We do not believe that the fact that a defendant has an attorney means that law enforcement officials cannot procure a statement of any kind from him without prior notice to, if not the consent, of the attorney." State v. Siegel, 366 So.2d 1358 at 1360, (La.1978), quoting State v. Cotton, 341 So.2d 355 at 359 (La.1977). A defendant may waive his sixth amendment right to legal representation when the government interrogates him after the commencement of adversarial proceedings, but "it is incumbent upon the [prosecution] to prove an intentional relinquishment of a known right or privilege." Jordan v. Watkins, 681 F.2d 1067 at 1075, rehearing denied, 688 F.2d 395 (5th Cir.1982), quoting Brewer v. Williams, 430 U.S. 387 at 404, 97 S.Ct. 1232 at 1242, 51 L.Ed.2d 424 (1977). The validity of a waiver is determined by carefully scrutinizing "the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." Jordan, supra at 1074 quoting Johnson v. Zerbst, 304 U.S. 458 at 464, 58 S.Ct. 1019 at 1023, 82 L.Ed. 1461 (1938).
The defendant in this case was a married twenty-two year old who had completed twelve years of school and had received his G.E.D. diploma. From the record, we have concluded that he had not been interrogated concerning the trailer incident from the time the April 5th interview ended until the time he himself reinitiated contact with the investigators the morning of April 7th. The defendant was present in court when the trial judge named his appointed attorney. There is no indication that the defendant subsequently requested that his attorney be notified of his intention to meet with the officers, nor is there any indication that he tried to contact the attorney. The record also clearly indicates that he was reminded during his afternoon statements of the fact that an attorney had been appointed for him. He was informed before those statements that he was free to consult with his attorney before making any statements and that he could end the interview at any time, should he so desire.
We conclude that the particular facts and circumstances surrounding this case, including the background, experience and conduct of the accused, strongly support the state's contention that Harper intentionally relinquished his known right to counsel when talking with police officers on April 7, 1981.
Accordingly the trial court's denial of defendant's Motion to Suppress was correct. This assignment lacks merit.
The remaining assignments of error as relate to these two trials and convictions will be discussed separately. The one assignment of error remaining for defendant's appeal of his conviction for the attempted murder of Martha Spinks (No. 82-KA-0764) challenges a denial of a motion for a mistrial. Those remaining for defendant's appeal of his conviction for the attempted murder of Pam Spinks (No. 82-KA-0763) *635 involve essentially challenges to the jury selection.[6]

Assignment of Error No. 2

Motion for Mistrial (82-KA-0764)
By this assignment defendant contends that the trial court erred in denying his Motion for Mistrial made during the testimony of Inspector Kay.
During direct examination, after both Martha Spinks and Pam Spinks had given full details of what had taken place at their residence and while the state was laying a foundation for introduction of photographs taken of the scene, Inspector Kay remarked:
This photograph is a photograph of the living room which merely shows the blood is on the carpet where they flopped around on the carpet floor. And this is adjacent to the kitchen area there.
* * * * * *
This is a photograph of the front door to the trailer where the exit of the girls that was fighting for their lives
To the subsequent defense objection and motion for a mistrial based on the highly prejudicial nature of the remarks, the trial judge responded:
The jury is admonished to disregard the statement just made by the witness and the witness is admonished to make a plain statement of what the photographs represent and not elaborate with details. The Motion for Mistrial is denied.
Defendant asserts that Kay's embellished descriptions of the photographs were prejudicial and designed to arouse the emotions of the jury. He further asserts that Kay's references to "the girls" in a trial involving an offense against only one of them constitutes references to another crime which requires a mistrial under C.Cr.P. Art. 770(2).
La.C.Cr.P. art 770(2) mandates a mistrial, upon motion of a defendant, "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:... [a]nother crime committed or alleged to have been committed by the defendant as to which evidence is not admissible." (Emphasis supplied) State v. Hayes, 414 So.2d 717 (La.1982). This Court has adhered to its position that a police officer is not a "court official" within the meaning of La.C. Cr.P. art. 770 and therefore a mistrial is not required even if a policeman in the course of testifying refers to another crime. Hayes, supra; State v. Carter, 412 So.2d 540 (La.1982). The appropriate remedy for inappropriate remarks by a police officer is an admonition to the jury to disregard the remark. La.C.Cr.P. art. 771. Such an admonition was indeed given in this case by the trial judge.
Furthermore Inspector Kay's use of the plural, "girls," is permissible as part of the res gestae of the attempted murder of Martha Spinks. La.R.S. 15:447 and 15:448.
The events in the instant case were inextricably intertwined with those of the accompanying prosecution for the attempted murder of Pam Spinks so that it would have been impossible for the state to present its case as to one without mention of the other. State v. Parker, 425 So.2d 683 at 693 (La.1982), (on rehearing). Accordingly Kay's references were permissible as part of the res gestae because of the "close connexity in time and location" of the noted events and the continuous nature of the transactions involved. State v. Haarala, 398 So.2d 1093 at 1097 (La.1981).
Finally, defendant's contention that Kay's subjective descriptions of the contents of the photographs was highly prejudicial is likewise without merit. Kay's statements did not make it impossible for Harper to obtain a fair trial. As this Court observed in State v. Tribbet, 415 So.2d 182 at 186 (La.1982):
A mistrial is a drastic remedy and except in instances in which it is mandatory, *636 is only warranted if substantial prejudice results which would deprive defendant of a fair trial. State v. Sepulvado, 367 So.2d 762 (La.1979). The determination of unnecessary prejudice lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. State v. Douglas, 389 So.2d 1263 (La.1980).
The trial court's admonition gave adequate notice to the jury that Kay's subjective references were not to be accorded any evidentiary value. The jury could view the photographs themselves and draw their own conclusions in the light of other testimony presented at trial.
This assignment lacks merit.

Assignments of Error Nos. 3, 4, and 5(No. 82-KA-0763)[7]
Defendant's assignments here arise out of the fact that the same jury venire from which the jury was selected at his second trial had witnessed the jury voir dire in his first trial. As we indicated earlier, the first trial commenced on Monday morning of November 30, 1981. The second trial commenced on Wednesday afternoon December 2, 1981, within minutes after the jury in the first trial had rendered its verdict. The jurors not selected in the first trial nonetheless were in court with the defendant and observed the entire jury voir dire of the first trial. After the jury was selected, they were not discharged but rather remained on call for jury selection for a second trial to be conducted at the conclusion of the first.
In the first trial, defense counsel had moved for and was denied individual voir dire examination of prospective jurors outside the presence of the rest of the venire. Immediately after the first trial and before the second trial, defense counsel moved for a continuance and for a change of venue. Both motions were denied.
Defendant reurged his motions on December 3, 1981, after one juror had been selected because of an article about the trial printed in the December 2, 1981, Ruston Daily Leader. The article, the lead item on the front page of the paper, essentially encapsulated all of the trial evidence from Harper's first trial, including the testimony of both victims and quotations from Harper's confessions. The trial court again denied defendant's motions, finding that Harper had failed to show substantial prejudice or an inability to obtain a fair and impartial jury.
In this appeal, defendant argues that the trial court erred in denying his motions for change of venue and for continuance, and further erred in refusing to sustain several juror challenges for cause.
The constitutional standard of fundamental fairness requires that a defendant be judged by a panel of impartial and unbiased jurors. This does not mean, however, that they must be totally ignorant of the facts and issues involved. State v. Willie, 410 So.2d 1019 (1982); State v. Bell, 315 So.2d 307 (La.1975). In some instances we have determined that a juror, who has read or heard about the case, can sufficiently lay aside his impression or opinion of defendant's guilt or innocence and render a verdict based on the evidence presented in court. See most recently, State v. David, 425 So.2d 1241 (La.1983). Usually it is incumbent upon the defendant "to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." State v. David, supra at page 1245 citing Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).
In unusual circumstances, prejudice against the accused may be presumed. State v. Goodson, 412 So.2d 1077 (La.1982). In Estes v. Texas, 381 U.S. 532 at 542-543, 85 S.Ct. 1628 at 1632, 14 L.Ed.2d 543 (1965), the U.S. Supreme Court said:

*637 It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.... "[O]ur system of law has always endeavored to prevent even the probability of unfairness." [quoting In re Murchison, supra (Emphasis in original)].
See also Murphy v. Florida, supra; Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1966).
Therefore we must carefully scrutinize the state's procedure of back-to-back trials using the same venire, particularly where, as here, the defendant was available for a later trial date (and a different venire) after his conviction in the first trial, and particularly here, where the facts of the cases were so closely connected. There is no doubt but that the venire in the instant case was tainted by its knowledge of defendant's earlier trial and, as relates to some of the jurors if not all, its outcome.[8] The issue becomes, then, whether the venire was so tainted that the prospective jurors failed to meet the minimum requirement that "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); State v. David, supra.
Some courts have taken the view that a juror should generally be disqualified in a subsequent criminal case involving the same defendant when that juror was present at or participated in the prior trial or related hearing of a criminal case. In a per curiam opinion, Leonard v. United States, 378 U.S. 544 at 545, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964), the U.S. Supreme Court agreed with the following proposition.
Prospective jurors who have sat in the courtroom and heard a verdict returned against a man charged with crime in a similar case immediately prior to the trial of another indictment against him should be automatically disqualified from serving at the second trial, if the objection is raised at the outset.
For other instances of the view that the juror under such circumstances is generally disqualified, see Annot. 6 A.L.R.3d 519 (1966).
There are two early Louisiana cases which have taken the view that a juror is not generally, or automatically, disqualified because he participated in an earlier criminal case involving the same defendant. State v. Wren, 121 La. 55, 46 So. 99 (1908); State v. Frazier, 209 La. 373, 24 So.2d 620 (1946).
In Wren, the defendant was tried on two charges of robbery, both heard on the same day, one immediately following the other. The defendants were acquitted in the first, convicted in the second. On appeal, they sought to overturn the conviction because "the first charge, although terminated by an acquittal, was calculated to injure them in the minds of the panel of jurors in attendance upon the court, all of whom had been present during the first trial." Wren, 46 So. at 100. The Court found that "the fact of the jurors having known that defendants had been tried and acquitted on another charge of robbery did not necessarily have the effect of disqualifying them as jurors." Id.
In Frazier the defendant was tried separately on charges of simple robbery and attempted murder. While the jury was deliberating on the charge of simple robbery, the attempted murder trial began. Defense counsel objected:
being of the opinion that it would be impossible for the accused to secure a fair and impartial trial by a jury impaneled from the same venire out of which the jury then deliberating on the robbery *638 charge against Frazier had been selected, especially since the members to be selected had been in the courtroom and had heard all of the evidence adduced on the charge against him for robbery, some of which was not presented in the case under consideration, contending that under these circumstances the jurors were "automatically and unintentionally" biased and prejudiced.
24 So.2d at 621
The Frazier conviction was upheld upon the court's finding that the jurors were fair men and were qualified to so act under their voir dire by virtue of their positive testimony that they would try the case of attempted murder on the evidence presented and not be influenced by the robbery trial.
Whatever the merit of those two decisions (and we have found no cases on point more recent than these), we have an entirely different and much more prejudicial situation in the case before us.
One hundred citizens of Lincoln Parish, Louisiana were summoned to the Third Judicial District Court on Monday, November 30, 1981, for trials of the several and varied charges pending against Henry Harper. The several offenses were severe and had received great notoriety. Lincoln Parish, the area from which the jury was drawn, has as its primary source of information the Ruston Daily Leader. There were press releases daily preceding and during Harper's trial for the attempted murder of Martha Spinks, which news coverage continued on into a subsequent trial for the attempted murder of Pam Spinks held in the same criminal jury week. Despite care exercised in the process of selecting the jury, it was extremely difficult for the defendant to empanel the jury for the second case. These same people, the jury panel members not chosen in the first trial, had access to the newspaper and radio, and saw Harper sitting at the defense table for approximately a day and a half of jury selection for the first trial. Nine of the jurors actually selected in the second trial, and this does not take into account the prospective jurors who were excused, were, at the least, cognizant of the fact that the defendant went to trial successively on two charges of attempted murder arising out of the same incident, and two of the jurors on the panel knew that Harper had been convicted of one before going to trial for the second. The opportunity for these jurors to give the defendant a fair and impartial trial for the second offense was seriously impaired.
Additionally the defendant was at a great disadvantage when these members of the venire came up for questioning. The defense counsel needed to explore whether or not they had any knowledge of what had taken place in the prior trial. Furthermore it would have been appropriate to ask if the prospective jurors knew what the verdict was in the first trial. For the defendant to ask such questions however, he would likely be suggesting to that prospective juror what had in fact transpired. And knowledge, imparted in court, of the earlier conviction could possibly have been grounds for a challenge for cause.
Defense counsel perceived his dilemma as follows: "[B]ecause we are going to have to ask some questions about the first trial and it is almost admitting in front of 60 some odd people in there that something went on before we got here. But we don't want to say what it was. So I don't see how we can, you know, we are in a `Catch-22' the defense is." We agree that he was in a damned-if-you-do-damned-if-you-don't situation which carried with it a high probability of unfairness.
This high probability for prejudice was compounded by the nature of the two charges for which Harper was tried consecutively.
As stated earlier, the two charges for the attempted murder of Martha Spinks and for the attempted murder of Pam Spinks are so closely related that the reference to each of the girls in the other's trial was admissible under the res gestae exception to the other crimes evidence prohibition. The purpose for allowing the "other crimes" references in situations where the state cannot have accurately presented one without the *639 other was explained in State v. Haarala, as follows:
In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, Law of Evidence 448 (2d ed. 1972).
398 So.2d at 1097.
Justice Dennis, speaking for this Court, continued:
The concomitant other crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. (Emphasis supplied)
When as in this case, the necessary references to the other crime (that against Martha) carries with them implications of guilt, it becomes more than probable that the jury in "attribut[ing] all of the criminal conduct to the defendant or none of it," will be affected in its deliberation in the second trial by knowledge of the defendant's trial and/or conviction in the first. Where the jury is aware that the defendant has just been tried for one of two incidents arising out of a single criminal escapade and some have learned that he had been found guilty in the first, it would be very difficult if not impossible for them to set that awareness aside in deliberating upon his guilt in the second.
The trial judge might have taken steps to avoid or minimize this potential for prejudice. He might have allowed voir dire questioning of prospective jurors in the first trial outside the presence of the rest of the specially-called venire. He might have granted defendant's motion for a continuance of the second trial. He might have granted defendant's motion for a change of venue for the second trial. Without deciding expressly which of these or other procedures were or might have been preferable, and whether any, or which, would have been sufficient to avoid prejudice to the defendant, we do determine that some preventive measures were surely essential. Under the circumstances presented therefore, we conclude that it was error not to grant the requested continuance or grant the motion to change venue.
For the foregoing reasons, and considering the local publicity given the victims' statements, given the defendant's confessions, and given defendant's first trial and conviction; we find that it was fundamentally unfair and a violation of due process in this case to have denied the continuance or venue change.

Decree
Accordingly, we reverse the defendant's conviction and sentence for the attempted murder of Pam Spinks and remand that case to the district court for further proceedings. We affirm defendant's conviction and sentence for the attempted murder of Martha Spinks.
CONVICTION AND SENTENCE IN 82-KA-0764 AFFIRMED.
CONVICTION AND SENTENCE IN 82-KA-0763 REVERSED; REMANDED.
DENNIS, J., joins fully in the opinion and decree affirming the conviction and sentence in 82-KA-0764, but respectfully dissents as to the reversal of the conviction and sentence in No. 82-KA-0763, and assigns reasons.
DENNIS, Justice, dissenting.
I respectfully dissent from the reversal of the conviction in 82-KA-0763. While I make no comment about the wisdom of the unorthodox venire procedure used in the two cases before us on appeal, after carefully reviewing the record of the voir dire in 82-KA-0763, I cannot subscribe to the majority's conclusion that the defendant is entitled to a presumption of prejudice, and I do not find that the evidence substantiates a claim of actual prejudice. Since the complaints of the defendant fall into two categories, I will discuss them accordingly.
First, the pretrial publicity surrounding the trials of the defendant was not of such a magnitude as to entitle the defendant to a *640 presumption of prejudice. Extensive knowledge in the community of either the crimes of the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair. Rather, a defendant is entitled to a presumption of unfairness of a constitutional magnitude only when the trial atmosphere has been utterly corrupted by press coverage. Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); State v. David, 425 So.2d 1241, 1247 (La.1983); State v. Goodson, 412 So.2d 1077 (La.1982). In this case, the only evidence introduced to substantiate the claim of prejudice was newspaper accounts of the facts and evidence of the first trial. This is in sharp contrast to the showings made in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In State v. Goodson, supra, we held that the introduction of thirty-five newspaper articles and one hundred and eight pages of transcripts of newscasts by local television stations publicizing the famed "highland rapist" did not warrant a presumption of prejudice. Of particular note in the instant case is the fact that all of the evidence of the crime prosecuted in the first trial was admissible in the second trial as part of the res gestae. Therefore, the degree of prejudice suffered by this defendant can only be considered minimal.
Second, the unorthodox venire procedure used in the two cases does not entitle the defendant to a presumption of prejudice. The general rule is that mere presence at a prior trial, or some related hearing, which involved the defendant, does not disqualify a juror absent some showing that the juror had formed an opinion as to the guilt or innocence of the defendant. Warden v. State, 214 Tenn. 398, 381 S.W.2d 247 (1964); State v. Frazier, 209 La. 373, 24 So.2d 620 (1946); Messer v. Commonwealth, 297 Ky. 772, 181 S.W.2d 438 (1944); Meadows v. State, 143 Tex.Cr.R. 611, 160 S.W.2d 528 (1942); Mainville v. State, 173 Wis. 12, 179 N.W. 764 (1920); State v. Wren, 121 La. 55, 46 So. 99 (1908); C. Torcia, Wharton's Criminal Procedure § 449 p. 251 (12th Ed.1975); 6 A.L.R.3d 519, 526 (1966). Nor does the fact that prospective jurors had knowledge of a prior verdict, or even discussed the case with jurors from a prior trial, entitle the defendant to a presumption of prejudice. State v. Hohman, 138 Vt. 502, 420 A.2d 852 (Vt.1980); Rutledge v. State, 264 S.E.2d 248, 152 Ga.App. 849 (1979). But see Head v. State, 377 So.2d 160 (Ala.1979) (six veniremen served on jury that convicted codefendant and five of the six stated that they could not be impartial).
I find the decision in Leonard v. United States, 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964), holding that prospective jurors may not serve if they were seated in open court at the time a verdict of a prior conviction is announced, distinguishable from the instant case. In United States v. Patterson, 648 F.2d 625 (1981) the Ninth Circuit Court of Appeal considered the very question of overlapping venires, distinguished Leonard, and concluded that "overlapping venires require reversal only if (1) the specific circumstances suggest a significant risk of prejudice and (2) examination or admonition of the jurors fails to negate that inference." 648 F.2d at 629. Accord Strode v. State, 257 Ark. 480, 517 S.W.2d 954 (Ark.1975); Byers v. State, 158 Tex. Cr.R. 642, 259 S.W.2d 196 (1953); Cady v. State, 198 Ga. 99, 31 S.E.2d 38, cert. denied, 323 U.S. 676, 65 S.Ct. 190, 89 L.Ed. 549 (1944). Cf. United States v. Phillips, 577 F.2d 688 (10th Cir.1978). But see Kelly v. State, 371 So.2d 162 (Fla.App.1979) (disallowing overlapping venires because the trial judge refused to allow questioning of individual veniremen to insure lack of prejudice and because several veniremen approached the bench and told the judge that they could not be impartial because of their familiarity with previous trial) and Marrero v. State, 343 So.2d 883 (Fla.App.1977) (analogizing overlapping venires to introduction of inadmissible "other crimes" evidence).
Our legislature has specifically provided that a juror is to be excused for cause if he served on the grand jury which found the indictment, or if he served on a petit jury *641 that once tried the defendant for the same or any other offense. La.Code of Crim. Proc. 797(5). Since there is no provision for exclusion for jurors who were part of a prior venire, the legislature has not abrogated the general rule that there is no automatic disqualification for a juror who was on the jury panel but was not included among the twelve jurors on a previous trial of defendant. C. Torcia, Wharton's Criminal Procedure, § 449 p. 255 (12th Ed.1975). Thus, this defendant should only be entitled to a reversal if he made a showing that the publicity surrounding his first trial, combined with the orthodox venire procedure, resulted in actual prejudice on the part of the prospective jurors in his second trial.
After closely examining the transcript of the voir dire in 82-KA-0763, I conclude that no such showing was made. Of all of the veniremen examined, only two indicated any difficulty at all in divorcing their knowledge of the past trial from their consideration of the subsequent indictment. These two jurors' testimony are highlighted by defense counsel in its brief to this Court, however, one of these jurors was excused on an unopposed challenge for cause, and the other was excused peremptorily (a challenge for cause was unsuccessful because this venireman indicated on further examination that she was able to consider only the evidence in the trial in reaching a decision). The trial judge allowed extensive voir dire examinations of all of the venire, and each juror stated with confidence that he would not be influenced by his knowledge of the prior trial. Two veniremen were eventually accepted as jurors who had knowledge of the previous conviction, but one was not challenged at all, and the other was "gladly accepted" by the defense. While the juror's assurances that he is equal to his task cannot be dispositive of the accused's rights, it is sufficient if the juror can lay aside impression or opinion and render a verdict based on the evidence presented in court. Murphy v. Florida, supra; Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642, 61 L.Ed.2d 751 (1962); State v. Goodson, supra.
In evaluating the truthfulness of the answers of prospective veniremen and in ruling upon the various challenges for cause, the trial judge displayed a great concern for the rights of his defendant. The voir dire does not reveal a trace of bias or inflexibility in the minds of the jurors eventually selected; on the contrary the jurors appeared to harbor confidence in their impartiality based on careful consideration. While again, this is not dispositive, in the absence of an indication of bias in the record we should not upset the determination of the trial judge, based, as it was, upon actual observation of the jury. Finally, the fact that the jury deliberated for five and one-half hours in 82-KA-0763, returning three times for instructions, while the jury in 82-KA-0764 deliberated only thirty minutes, belies any imputation of bias. See State v. Hohman, supra, 420 A.2d at 852. Under these circumstances, I cannot say that the defendant is entitled to a new trial.
NOTES
[1] Because of the pendency of approximately fifty felony cases per jury term, a Special Term was called to relieve some of the backlog. However, only the various cases against Henry Harper were actually fixed for trial during that term.
[2] Defense counsel notes in his brief on appeal that this motion and assignment of error involving double jeopardy was made when the District Attorney's office had not yet informed the defendant of the order in which they would try the eight different charges pending against him involving the two victims. This motion was made out of an abundance of caution in case the District Attorney's office were to decide to try the other charges involving Martha Spinks, the attempted murder victim in the first trial. Because the charge against the defendant relative to Pam Spinks and not Martha Spinks was taken up in the second trial, this assignment has not been argued.
[3] None of Harper's responses to the minimal questioning which took place before he expressed an interest in having a lawyer were inculpatory. Nor were the few answers given after his invocation of his right to an attorney either inculpatory or of any real consequence.
[4] Harper did not actually meet with his attorney until the following day, April 8, 1979. In this regard, this case differs from State v. Weedon, 342 So.2d 642 (La.1977). In Weedon, defense counsel was present when the defendant was arrested. Defense counsel had emphatically instructed his client not to speak to the authorities about the offense and had obtained an express agreement from the arresting officers that they would not so inquire of the defendant.
[5] The court minutes of April 7, 1981, reflect that the defendant indicated that his family might retain counsel for him. Finding him indigent, however, the trial court appointed the above named attorney as counsel for "the present time and until other counsel might be retained by family of the defendant, so that said defendant would not be without the benefit of counsel in this matter."
[6] Defendant's assignment of error regarding possible double jeopardy violations has been abandoned. See note 3, supra.
[7] As noted earlier, defendant's assignment of error No. 1 in this case concerns the motion to suppress his taped statements, which we have addressed and found to be without merit earlier in this opinion. Defendant did not argue on appeal his assignment of error No. 2. See note 3 supra.
[8] Of the twelve jurors who were chosen nine admitted knowing that Harper had previously been tried on another charge of attempted murder earlier in the week and at least two of those nine knew that Harper had been found guilty after his first trial.